1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RYAN YOUNG, individually and on              No.  2:11-cv-02491-KJM-AC
     behalf of those similarly situated,
12
                  Plaintiff,
13                                                 ORDER
             v.
14
     DR. JEFFREY BEARD, in his capacity as
15   the Secretary of the California Department
     of Corrections and Rehabilitation,
16
                  Defendant.
17

18

19               The plaintiffs are correctional officers.  They allege their employer, Mule Creek

20   State Prison, requires them to work overtime without pay.  The defendant, Dr. Jeffrey Beard,[1] has

21   moved for summary judgment and to decertify the conditionally certified class.  The court heard

22   argument on the motions on November 14, 2014.  Gregory Alumit appeared for Mr. Young.

23   Jennifer Garten and David King appeared for Dr. Beard.  After considering the parties' briefs and

24   arguments, the court grants the defendant's motion for summary judgment and denies the motion

25   to decertify as moot.

26

27          [1] Matthew Cate was Secretary of the Department of Corrections and Rehabilitation when
     Officer Young filed the complaint.  First Am. Compl. ¶ 9, ECF No. 17.  Dr. Jeffrey Beard is the
28   current Secretary and is substituted as defendant.  Fed. R. Civ. P. 25(d).

                                                  1

I.        BACKGROUND

A.        Undisputed Facts

Ryan Young is a correctional officer at Mule Creek State Prison, or MCSP, in Ione, California.  Order Feb. 22, 2013, at 1, ECF No. 58.  He represents a conditionally certified class of other officers who work at MCSP.  *Id.* at 9.  Dr. Beard is the current Secretary of the California Department of Corrections and Rehabilitation, or CDCR, the organization responsible for operating MCSP.  Def.'s Mot. Summ. J. 1, ECF No. 99-1.  This order adopts the parties' convention and refers to the defendant as MCSP or the prison.  In the factual summary that follows, when the court determines the parties do not genuinely dispute a material fact, the court refers to the parties' statement of undisputed facts.  *See* Def.'s Reply Pls.' Stmt. Undisp. Mat. Facts (UMF), ECF No. 117-1.

The officers are represented by the California Correctional Peace Officers' Association (CCPOA), an organization that negotiates on their behalf with the State of California over wages, hours, and other terms of employment.  UMF no. 2. The officers' schedule, salary, and overtime compensation are described in a Memorandum of Understanding between CCPOA and the State.  *Id.* nos. 3, 4.  The agreed work schedule requires officers to work five 8-hour shifts in each 7-day period, *id.* no. 7, but compensates them for 7-day periods of 41 hours, *id.* no. 5. Pay for the forty-first hour is meant to compensate unscheduled work done before and after the officers' 8-hour shifts.  *Id.* no. 8. Any work beyond 41 hours in a 7-day period is compensated as overtime.  *Id.* no. 5.

Officers like Mr. Young also accrue leave credits, which they may charge against to take time off.  *Id.* no. 12.  One way an officer may charge leave credits is by submitting a "Holiday Time Off" or HTO request form.[2]  *Id.* no. 13.  Despite the form's name, officers may use HTO request forms to request time off on any day of the year.  *Id.* no. 16.  Officer Young's

---

[2] Officers may also request time off by participating in a vacation bid process.  UMF no. 14.  For reasons not apparent from the record here, officers normally use the HTO request process to request single days off and use the vacation bid process to request time off in whole-week increments.  *Id.* nos. 14, 15.

1   complaint and this case are about the process MCSP uses to accept HTO request forms.  Am.

2   Compl. ¶¶ 13–15.  The process is best understood in context.  Because MCSP must operate

3   twenty-four hours a day every day, it must staff all its posts at all times, UMF no. 10, and not

4   every request for time off can be granted, *id.* nos. 29, 31.  MCSP grants only a certain, pre-

5   determined number of requests every day.  *Id.* no. 30; Karr Dep. 75:14–76:15.  Lieutenant Matt

6   Karr, the person MCSP designated most knowledgeable about the HTO request process under

7   Federal Rule of Civil Procedure 30(b)(6), testified the predetermined number is five: one for the

8   shift beginning at 10 p.m. and two each for the shifts beginning at 6 a.m. and 2 p.m.  Karr Dep.

9   76:1–9; UMF no. 11.

10          An officer begins the HTO process by completing an HTO request form, which

11   must identify the date, shift, and post for which the officer requests leave.  UMF no. 28.  Officers

12   may turn in completed forms on any day and at any time, but only within a specific HTO

13   submission window.  *Id.* nos. 32, 42, 43.  If an officer wants to take the day off on March 15 for a

14   shift beginning at 6 a.m., the window opens on February 15 at 5:30 a.m., one calendar month and

15   one half-hour before the target shift.  *Id.*  The window closes on March 15, the day the officer

16   wishes to take leave.[3]  *Id.*  All else equal, a request submitted earlier within that window has

17   priority over a request submitted later.  *Id.* nos. 34–36.  Naturally then, officers have an incentive

18   to submit requests as early as possible.  *See id.* no. 36.  In an apparent effort to determine which

19   forms are submitted first, MCSP requires officers to place official time stamps on completed

20   HTO request forms when submitted.  *Id.* no. 26.

21          HTO forms may only be submitted in the watch office, *id.* no. 26, which is inside

22   MCSP, *id.* no. 24.  To enter the prison, correctional staff first drive through the front gate.  *Id.*

23   no. 18.  After showing an ID, an officer parks and passes on foot through another gate, this time

24   to enter the secured perimeter.  *Id.* nos. 18, 19.  Employees and the public use the same entrance

25   to the prison and the secured perimeter.  *Id.* no. 20.  At the entrance to the secured perimeter, an

26   officer must again show ID, swipe an ID card, and open any bags for inspection.  *Id.* no. 21.

27

28          [3] The parties dispute whether the window actually closes the day before.  *See* UMF no. 32.
     This distinction is not material for purposes of this motion.

1    Within the secured perimeter, officers show their IDs again and pass through a sally port to the

2    central services building.  *Id.* no. 24.  The watch office is inside the central services building.  *Id.*

3    Lieutenant Karr testified it takes about three minutes to reach the watch office from the parking

4    lot, including time spent passing through security checks.  *Id.* no. 25; Karr Dep. 42:16–22.  Karr

5    estimated the distance from the parking lot to the prison's inmate yards is about 150 to 180 yards.

6    Karr Dep. 13:21–15:8.  The officers dispute Karr's estimate of a three-minute walk, but do not

7    offer an alternative time estimate, relying instead on inference from the distance an officer must

8    travel and number of security checks required: officers must pass through two security checks,

9    open bags for inspection, swipe ID cards, proceed to Main Control, pass through gates to the

10   prison yards (only one of the three gates may be open at the same time), and walk to the Program

11   Office.  *See* UMF no. 25.  They agree the distance from the parking lots to the prison yards is

12   about 150 yards.  *Id.*  At hearing, counsel conceded they had no time estimate of their own to

13   compete with Karr's three minutes.

14          Because only one or two HTO requests are granted for a given shift on a given

15   day, officers may arrive at the watch office even before the window opens for the most popular

16   days of Thanksgiving, Christmas, Independence Day, and weekends in general.  *Id.* no. 41;

17   Stewart Dep. 49:14–50:9.  The earliest any plaintiff testified he or she has arrived to stamp an

18   HTO request was one hour before a shift.  UMF no. 68.  MCSP accepts HTO forms at any time

19   within the submission window, however, *id.* no. 50, and many officers, including the plaintiff

20   class members, have successfully submitted HTO request forms later than the earliest possible

21   time, *id.* no. 49.  Officers may even fill out and submit requests while on duty, but may be

22   required to ensure their posts are covered during this time or obtain a supervisor's approval.  *Id.*

23   no. 48; King Decl. Ex. 48 *passim*, ECF No. 102-1 to -2.

24          Although MCSP requires officers to wear a uniform at work and arrive in uniform

25   to begin a shift, Karr Dep. 21:12–22:21, it does not require that officers submit HTO requests in

26   uniform, UMF no. 51, imposing rather only general dress code standards, *id.*; Pls.' Opp'n Mot.

27   Summ. J. (Opp'n MSJ) 2:12–20, ECF No. 114; Karr Dep. 9:19–10:5; Breen Dep. 31:17–34:2,

28   34:14; Evans Dep. 25:20–26:11.  If an officer arrives early to submit an HTO request form,

4

MCSP does not monitor the officers' location or activity and does not require they perform any routine duties.  UMF no. 61.  At the same time, it does not allow the use of books or cell phones during this time, if the officer stays on the property.  Evans Dep. 35:7–15; Breen Dep. 50:20–24; Karr Dep. 98:11–99:3.  Officers may exit the secured perimeter and return to their cars before beginning a shift, although most do not.  UMF nos. 57, 60; King Decl. Ex. 60, *passim*; Karr Dep. 97:22–98:7.  Emergencies may arise, and officers may be required to respond while off-duty, but MCSP policy directs officers to report any time spent responding to emergencies for compensation.[4]  UMF no. 62.  The parties dispute the frequency of these emergencies.  *See id.*  The prison suggests they are "rare," and the officers suggest they must respond "many times."  *Id.*  In addition, if an emergency occurs, officers may not leave the secured perimeter.  Quezada Dep. 18:7–21.

Officers who arrive early to submit an HTO request form typically walk from the watch office to the program office, where they wait to sign an "FLSA sheet," a timesheet.  UMF no. 56.  Regardless of whether an officer arrives early to submit an HTO request form, officers must sign the same FLSA sheet before every shift.  *Id.* no. 56; Karr Dep. 45:23–46:1.  Officers do not fill out this sheet; it reflects each shift's start time before an officer signs it, and an officer does not receive additional compensation by signing the sheet early unless specifically hired to arrive early.  Karr Dep. 53:3–17.  The sheets are usually available about ten or fifteen minutes before a shift begins.  UMF no. 58.  After signing an FLSA sheet, officers typically walk to their posts, relieve the officer from the previous shift, collect gear, and exchange any information about fights, emergencies, and similar topics.  Karr Dep. 19:12–21:10; Stewart Dep. 46:19–47:23.

B.    Procedural History

Ryan Young initiated this action in September of 2011.  Compl. ECF No. 1.  He alleged the HTO request process violates the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201–219, because the process leaves him and other officers no choice but to arrive at work at

---

[4] The officers dispute the fact they are compensated for time spent responding to emergencies because they must fill out timesheets and obtain a supervisor's approval, and aver approval is not always forthcoming.  But they do not dispute that the prison's policy is to compensate them for this time.  *See* UMF no. 62.

5

1    least thirty minutes early whenever they submit an HTO request.  Compl. at 6:8–26; Am. Compl.

2    ¶¶ 13–15.  They argue the practical circumstances of their employment interact with the HTO

3    request process to require they perform compensable work from the moment they arrive to submit

4    an HTO form.  Compl. 6:8-7:2; Am. Compl. ¶¶ 13–15.  The complaint originally sought

5    declaratory relief, certification as a collective action, damages, and other remedies, including that

6    the court retain jurisdiction "until such time as it is satisfied that [the defendant has] remedied the

7    practices complained of and are determined to be in full compliance with the law."  Compl. 8:25–

8    9:21.  On November 29, 2011, the court granted the defendant's motion to dismiss the original

9    complaint, finding sovereign immunity barred any claim for retroactive relief, but allowed leave

10   to amend.  Minutes, ECF No. 16.  Thereafter the officers' amended complaint purported to seek

11   only prospective relief, Am. Compl. at 9, but nevertheless included the assertion that Officer

12   Young and the class "seek unpaid compensation, an equal amount of liquidated damages and

13   prejudgment interest, attorneys' fees, and costs," *id.* ¶ 4.

14          The court granted the officers' request to conditionally certify a class of "rank-

15   and-file correctional officers" in February 2013.  Order Feb. 22, 2013, at 9:3–6, ECF No. 58.  The

16   class definition includes "any and all rank-and-file correctional officers currently employed at

17   Mule Creek State Prison who [were] not paid overtime compensation for working in excess of the

18   applicable FLSA overtime threshold when requesting holiday time off."  Joint Req. Class Notice

19   Ex. A, at 3:2–5, ECF No. 59-1.  The court and parties anticipated MCSP would later move to

20   decertify the action.  *See* Order Feb. 22, 2013, at 3:17–19, ECF No. 58.

21          After discovery had progressed, on October 9, 2014, MCSP filed two motions,

22   requesting summary judgment, Am. Mot. Summ. J., ECF No. 99, and decertification of the

23   conditionally certified class, Mot. Decert., ECF No. 104.  MCSP's motion for summary judgment

24   is based on four arguments: (1) submitting HTO request forms is not "work" for purposes of the

25   FLSA; (2) the officers' time spent filling out HTO request forms does not exceed the number of

26   hours required to allege an FLSA claim; (3) time spent filling out an HTO request form is already

27   compensated; and (4) the claim remains barred by sovereign immunity.  Mot. Summ. J. 2: 4–13,

28   ECF No. 99.  MCSP argues the class should be decertified because (1) the facts and

6

1  circumstances of the officers' employment are too diverse, (2) the officers' claims would be

2  subject to individualized defenses, and (3) continued certification would be unfair and prejudicial.

3  Mot. Decert. 2:3–8, ECF No. 104.  The officers opposed both motions on October 31, 2014.

4  Opp'n MSJ, ECF No. 114; Opp'n Mot. Decert., ECF No. 115.  MCSP replied on November 7,

5  2014.  Def.'s Reply Mot. Summ. J., ECF No. 117; Def.'s Reply Mot. Decert., ECF No. 116.

6  II.   DISCUSSION

7         Whether California's sovereign immunity bars this suit is a jurisdictional question

8  and must be resolved before evaluating defendant's motions for summary judgment and to

9  decertify.  *See Actmedia Inc. v. Stroh*, 830 F.2d 957, 963 (9th Cir. 1986).

10        A.   Sovereign Immunity

11        The defendant is an officer of the State of California and is sued in his official

12  capacity.  The Eleventh Amendment prevents federal courts from hearing certain claims: "States

13  may not be sued in federal court unless they consent to it in unequivocal terms or unless

14  Congress, pursuant to a valid exercise of power, unequivocally expresses its intent to abrogate the

15  immunity." *Green v. Mansour*, 474 U.S. 64, 68 (1985) (citing *Pennhurst State Sch. & Hosp. v.*

16  *Halderman*, 465 U.S. 89, 99 (1984)).  The FLSA does not waive Eleventh Amendment sovereign

17  immunity for suits by individuals.  *See Alden v. Maine*, 527 U.S. 706, 712 (1999); *Quillin v. State*

18  *of Or.*, 127 F.3d 1136, 1139 (9th Cir. 1997) (per curiam).

19        The Supreme Court long ago established an exception to this general bar for

20  actions seeking prospective relief to prevent continuing violations of federal law.  *Ex parte*

21  *Young*, 209 U.S. 123, 159–60 (1908).  "Remedies designed to end a continuing violation of

22  federal law are necessary to vindicate the federal interest in assuring the supremacy of that law."

23  *Green*, 474 U.S. at 68.  The exception of *Ex parte Young*, however, does not allow a plaintiff to

24  seek an injunction ordering the award of retroactive benefits for past violations of federal law.

25  *Edelman v. Jordan*, 415 U.S. 651, 664–65 (1974).  For this reason, awarding prospective

26  declaratory judgment may be improper if it "would have much the same effect as a full-fledged

27  award of damages or restitution by the federal court," allowing a "partial end run" around the rule

28  of *Edelman*.  *Green*, 474 U.S. at 73.  In *Green*, the petitioners had asserted no ongoing violation

of federal law, so "the award of a declaratory judgment . . . would [have been] useful in resolving the dispute . . . only if it might [have been] offered in state-court proceedings as res judicata on the issue of liability, leaving to the state courts only a form of accounting proceeding whereby damages or restitution would be computed." *Id.*

The Supreme Court has described the appropriate inquiry as "straightforward," requiring a court determine whether the "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (citations and internal quotation marks omitted). But Court has also observed, "the distinction between prospective and retrospective relief" is not always as clear as "'that between day and night.'" *Cardenas v. Anzai*, 311 F.3d 929, 935 (9th Cir. 2002) (quoting *Edelman*, 415 U.S. at 667). To add another wrinkle, the Supreme Court has allowed individual actions against a state to go forward when the action seeks an "end to a present violation of federal law . . . even though accompanied by a substantial ancillary effect on the state treasury." *Papasan v. Allain*, 478 U.S. 265, 278 (1986).

Here the officers seek "a declaratory judgment that the practices complained of . . . are unlawful under FLSA." Am. Compl. at 9. They request "the Court retain jurisdiction over all defendants [sic] until such time as it is satisfied that they have remedied the practices complained of and are determined to be in full compliance with the law." *Id.* Elsewhere, however, the officers reveal their intention to seek "unpaid compensation, an equal amount of liquidated damages and prejudgment interest, attorneys' fees, and costs." *Id.* ¶ 4. In their briefing on the motion for conditional certification, the plaintiffs also wrote, "any member of this class . . . will have a Court Judgment finding that certain actions violate the FLSA and such individuals will be able to utilize such in any administrative proceeding that may take place." Pls.' Reply 6:26–7:3, ECF No. 56. Ryan Young also testified in his deposition that he expected monetary damages if he prevails. Young Dep. 176:20–25. At the hearing on this motion, however, the officers' counsel reiterated their intent to seek only prospective declaratory relief.

In *New York State Court Clerks Association v. Unified Court System of the State of New York*, the plaintiffs asserted FLSA claims and alleged their employer, an arm of New York

1  State, required them to work overtime without pay.  25 F. Supp. 3d 459, 462–65 (S.D.N.Y. 2014).

2  The plaintiffs sought a declaration that "Defendants have and continue to willfully and

3  wrongfully violate their statutory obligations under the FLSA."  *Id.* at 464.  The federal district

4  court dismissed the complaint because "there [was] no disputed issue of law to be resolved."  *Id.*

5  at 471.  It distinguished other FLSA cases in which the plaintiffs sought prospective declaratory

6  relief because in those cases, the plaintiffs sought resolution of "rights and other legal relations,"

7  such as exempt status and the proper way to calculate the rate of pay.  *Id.* at 470–71.

8        Among the cases distinguished in *New York Clerks* was *Silveira v. Beard*,

9  No. 13-0084, 2013 WL 2458393 (E.D. Cal. June 6, 2013).  In *Silveira*, the plaintiffs sought a

10  declaration that the defendants "violated" the FLSA, a retrospective request, but elsewhere the

11  plaintiffs' complaint sought prospective relief: it alleged the defendants "continue[d] to violate

12  the FLSA" and sought a declaration the defendants' conduct "violates" the FLSA.  *Id.* at *5.

13  Although the court dismissed the complaint, it allowed the plaintiffs leave to amend to "describe

14  the precise declaratory relief sought, meaning . . . which specific practices . . . are presently

15  violating which specific provisions of the FLSA."  *Id.*  Similarly, in *Balgowan v. New Jersey*, the

16  Third Circuit allowed the plaintiffs to seek a declaration they were not exempt from the FLSA's

17  overtime provisions.  115 F.3d 214, 216–218 (3d Cir. 1997).  *See also Dino v. Pennsylvania*,

18  No. 08-01493, 2009 U.S. Dist. LEXIS 112821, at *7–8 (M.D. Pa. Sept. 4, 2009) (relying on

19  *Balgowan*).

20        The court sees no clear distinction between, on the one hand, a request to decide

21  whether an employee is exempt or wages are calculated incorrectly, as in *Silveira*, *Balgowan*, or

22  *Dino*, and on the other, a request to declare that the HTO request procedure in this case is

23  required uncompensated "work."  In each example, the parties request an application of law to

24  fact on a contested point.  More importantly, the core holding of *Green v. Mansour* does not

25  require district courts to distinguish between variously specific or general requests and to resolve

26  some and not other questions of law; rather, *Green* bars retrospective suits in disguise.  *See* 474

27  U.S. at 73 ("There is no claimed continuing violation of federal law, and therefore no occasion to

28  issue an injunction.  Nor can there be any threat of state officials violating the repealed law in the

9

1   future."). Here, MCSP continues to implement the allegedly offending HTO request policy. The

2   parties dispute the applicability of the FLSA to that policy. The court declines to discount the

3   officers' expressed intent to compel conformity with what they believe the FLSA requires.

4          Finally, the First Circuit has held that even prospective declaratory judgments may

5   not be available to private plaintiffs asserting FLSA claims, reasoning that the FLSA permits only

6   the Secretary of Labor to bring claims for injunctive relief. *See Mills v. State of Me.*, 118 F.3d 37,

7   55 (1st Cir. 1997) (citing *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 73 (1996)). As noted

8   above, the Third Circuit has held otherwise. *See Balgowan*, 115 F.3d at 218. The Ninth Circuit

9   has not directly ruled on this question, but has cited *Balgowan* for the proposition that "private

10  individuals may sue state officials for prospective relief against ongoing violations of federal law"

11  even when injunctive relief is unavailable, and that "the Eleventh Amendment does not generally

12  bar declaratory judgment actions against state officers." *Nat'l Audubon Soc'y, Inc. v. Davis*, 307

13  F.3d 835, 847 (9th Cir.), *opinion amended on denial of reh'g*, 312 F.3d 416 (2002). Neither party

14  has directly addressed the issue and the court does not reach it here.

15         Sovereign immunity does not bar this suit, and the court has jurisdiction to address

16  MCSP's motions.

17      B.   Motions for Summary Judgment in General

18         A court will grant summary judgment "if the movant shows there is no genuine

19  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

20  Civ. P. 56(a). A trial court in receipt of a motion for summary judgment performs a "threshold

21  inquiry" to decide "whether there is the need for a trial." *Anderson v. Liberty Lobby, Inc.*,

22  477 U.S. 242, 250 (1986).[5] The judge does not make findings of fact, but decides more

23  fundamentally whether "there are any genuine factual issues that properly can be resolved only by

24  a finder of fact because they may reasonably be resolved in favor of either party." *Id.* Only

25  "*genuine* issue[s] of *material* fact" matter; only "disputes over facts that might affect the outcome

26
            [5] Rule 56 was amended, effective December 1, 2010; however, it is appropriate to rely on

27  cases decided before the amendment took effect, as "[t]he standard for granting summary
    judgment remains unchanged." Fed. R. Civ. P. 56, Notes of Advisory Comm. on 2010

28  amendments.

1   of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at

2   247–48.

3              The party who moves for summary judgment, here MCSP, bears the initial burden

4   of "informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*,

5   477 U.S. 317, 323 (1986).  Rule 56 does not require MCSP "negate" the officers' claims. *Id.*  It

6   requires MCSP show "there is an absence of evidence to support the nonmoving party's case," *id.*

7   at 325, or otherwise "the absence of a genuine issue of material fact," *id.* at 323.  If MCSP meets

8   this burden, the officers must then respond and show the case is in fact proper for trial, that is,

9   they must "establish that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus.*

10  *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).  Both parties must "cit[e] to particular parts

11  of materials in the record . . . ; or show[] that the materials cited do not establish the absence or

12  presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

13  support the fact."  Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[The

14  nonmoving party] must do more than simply show that there is some metaphysical doubt as to the

15  material facts.").  Unsupported assertions are insufficient: "The very mission of the summary

16  judgment procedure is to pierce the pleadings and to assess the proof."  Fed. R. Civ. P. 56(e)

17  advisory comm. notes on 1963 amendments.  Finally, because MCSP has moved for summary

18  judgment, the court draws all inferences and views all evidence in the light most favorable to the

19  officers. *Matsushita*, 475 U.S. at 587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).

20         C.     The FLSA and Compensable Work

21             In general, the Fair Labor Standards Act (FLSA) requires employers pay

22  employees for all hours worked. *Alvarez v. IBP, Inc.*, 339 F.3d 894, 902 (9th Cir. 2003), *aff'd in*

23  *part, rev'd on other grounds sub nom. IBP v. Alvarez*, 546 U.S. 21 (2005).  An employer must

24  pay its employees a certain minimum wage for the first forty hours of work in a week, and at least

25  one and one-half times that wage for any hours beyond forty.  29 U.S.C. §§ 206(a), 207(a)(1).

26  Section 207(k)(1) of Title 29, however, makes an exception to this general provision for "any

27  employee in . . . law enforcement activities (including security personnel in correctional

28  institutions)."  This exception applies to state prisons and to all correctional officers, regardless of

duties or rank.  29 C.F.R. § 553.211(f).  Under section 207(k), no overtime pay is required for up

to 171 hours worked in a 28-day period or a proportional number of hours for periods between 7

and 28 days.  29 U.S.C. § 207(k); 29 C.F.R. § 553.230.  *See also Adair v. City of Kirkland*,

185 F.3d 1055, 1060 (9th Cir. 1999) ("The '7(k) exemption' increases the overtime limit slightly

and it gives the employer greater flexibility to select the work period over which the overtime

limit will be calculated.").  The Portal-to-Portal Act exempts certain activities, so that an

employee's time spent on those activities is not compensated and does not accrue toward the

overtime limit.  29 U.S.C. § 254.  These exempted activities include "walking, riding, or traveling

to and from the actual place of performance of the principal activity or activities which such

employee is employed to perform" and "activities which are preliminary to or postliminary" to

the "principal activity or activities" of employment.  *Id.* § 254(a).

Here, the officers allege they receive no compensation for time spent before their

shifts turning in HTO request forms, an activity which may fairly be classified as preliminary to

their principal assignments.  But these preliminary activities are compensable if they are an

"integral and indispensable part" of MCSP's "principal activities."  *Steiner v. Mitchell*, 350 U.S.

247, 256 (1956).  The Ninth Circuit requires a "three-stage inquiry."  *Bamonte v. City of Mesa*,

598 F.3d 1217, 1224 (9th Cir. 2010) (citing *Alvarez*, 339 F.3d at 902–03).  First, the activity must

be "work."  *Id.*  Second, it must be "integral and indispensable" to the principal work performed.

*Id.*  And third, an activity is not compensable if it is *de minimis*.  *Id.*

      1.    <u>Work</u>

The FLSA does not define "work" for purposes of the FLSA.  *Sandifer v. U.S.

Steel Corp.*, ___ U.S. ___, 134 S. Ct. 870, 875 (2014).  The Supreme Court has: work is "physical

or mental exertion (whether burdensome or not) controlled or required by the employer and

pursued necessarily and primarily for the benefit of the employer."  *See Tenn. Coal, Iron & R. Co.

v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944).[6]  This definition has two parts: "controlled

---

[6] "Other than its express exceptions for travel to and from the location of the employee's 'principal activity,' and for activities that are preliminary or postliminary to that principal activity, the Portal-to-Portal Act does not purport to change this Court's earlier descriptions of the terms 'work' and 'workweek,' or to define the term 'workday.'  A regulation promulgated by the

1  or required by the employer," and "pursued necessarily and primarily for the benefit of the

2  employer." *Bamonte*, 598 F.3d at 1224.

3          Neither part of the definition favors the officers.  The HTO request procedure is

4  "controlled by the employer" in the sense that the prison specifies the procedure the officers must

5  use to submit HTO requests.  It is "required by the employer" in the sense that officers may not

6  request time off unless by using this procedure or one of the other procedures the prison specifies.

7  At the same time, MCSP does not require the officers to take time off and does not require them

8  to fill out, stamp, or turn in HTO requests at any particular time or on a particular day.  It does not

9  require the officers to submit the forms off-duty and does not discipline them for submitting

10  forms while on-duty.  The officers do have an incentive to submit their requests at the beginning

11  of the HTO window, when they are usually off-duty.  Under the right circumstances, an incentive

12  could effectively operate as a requirement, but it does not here.  Sixteen of the twenty officers

13  deposed in this case testified they had submitted HTO requests while on-duty and that these

14  requests were granted.  *See* King Decl., Ex. 48, *passim*.

15          The HTO request procedure at issue is "pursued necessarily and primarily for the

16  benefit of the employer" only when compared to a world in which the prison offers the same

17  amount of time off but allows officers to request time off at any time they choose.  The procedure

18  serves MCSP's interests because it allows the prison to manage how many officers take time off

19  and find replacements.  But it also represents a compromise between two competing goals:

20  allowing officers to take time off when they want to, while preventing personnel shortages.  For it

21  is MCSP that must find replacements for officers who take time off.  Such a compromise is not

22  sufficient for plaintiffs' purposes here.  For the process to be work, it must be necessarily and

23

---

24  Secretary of Labor shortly after its enactment concluded that the statute had no effect on the
   computation of hours that are worked 'within' the workday.  That regulation states: '[T]o the
25  extent that activities engaged in by an employee occur after the employee commences to perform
   the first principal activity on a particular workday and before he ceases the performance of the
26  last principal activity on a particular workday, the provisions of [§ 4] have no application.'"  *IBP*,
27  546 U.S. at 28 (quoting 29 CFR § 790.6(a) (2005)) (alterations in *IBP*); *see also Integrity Staffing
   Solutions, Inc. v. Busk*, ___ U.S. ___, 135 S. Ct. 513, 517–19 (2014) (describing the effect of the
28  Portal-to-Portal Act).

1 | primarily for MSCP's benefit.  Allowing officers to take unscheduled time off is not something

2 | MSCP provides for its benefit; rather it a benefit the prison provides to officers.

3 |         Other district courts have consulted three factors to decide whether an activity is

4 | work: "whether the employer selected the individuals who participated, dictated the extent of

5 | participation, or disciplined individuals for not participating." *Kayser v. Sw. Bell Tel. Co.*,

6 | 912 F. Supp. 2d 803, 810 (E.D. Mo. 2012) (citing *Local 1605 Amalgamated Transit Union,*

7 | *AFL-CIO v. Cent. Contra Costa Cnty. Transit Auth.*, 73 F.Supp.2d 1117, 1122 (N.D. Cal. 1999)).

8 | These factors also weigh in favor of granting the prison's motion.  MCSP does not select which

9 | officers submit HTO request forms and does not discipline an officer for submitting or not

10 | submitting an HTO form.  Only the second factor could possibly weigh in the officer's favor, but

11 | here it does not.  Officers either submit forms or do not, and they may use an alternative

12 | procedure to request time off.

13 |         Even if submitting an HTO request form were "work," the activities surrounding

14 | submission are not work.  Officers must sign FLSA sheets and arrive dressed for work every day,

15 | not just on days they submit HTO request forms.  The officers do not strengthen their case by

16 | showing they arrive early at their posts to relieve their outgoing counterparts.  Employees who

17 | report to work early "for their own convenience" or the convenience of their fellow employees

18 | are not performing compensable work.  *Lindow v. United States*, 738 F.2d 1057, 1061 (9th Cir.

19 | 1984) (citing *Blum v. Great Lakes Carbon Corp.*, 418 F.2d 283, 287 (5th Cir. 1969) and *Jackson*

20 | *v. Air Reduction Co.*, 402 F.2d 521, 524 (6th Cir. 1968)).

21 |         If the officers submit HTO request forms before their shifts begin, they are not

22 | monitored, supervised, or required to do anything else without pay.[7]  "Periods during which an

23 | employee is completely relieved from duty and which are long enough to enable him to use the

24 | time effectively for his own purposes are not hours worked. . . . Whether the time is long enough

25 | to enable him to use the time effectively for his own purposes depends upon all of the facts and

26 |

        [7] Should an officer be required to respond to an emergency while off duty, MCSP's policy
27 | is to compensate the officer for that time.  *See* King Decl. Ex. 62, *passim*.  The officers cannot
claim they receive no compensation for this time simply because they must submit an approved
28 | FLSA sheet to describe how long they worked while responding.  *See* UMF no. 62.

1    circumstances of the case." 29 C.F.R. § 785.16(a).  While they wait for a shift to begin, the

2    officers may walk to the program office to wait for and sign an FLSA sheet.  Although the

3    officers suggest they must sign FLSA sheets fifteen minutes before their shift begins, the

4    evidence shows only that these forms are available up to fifteen minutes before a shift.  It is true

5    officers may not read books or use cell phones in the prison, but MCSP cannot be said to require

6    work simply because it prevents officers from reading or texting.  The plaintiffs have testified

7    they may socialize, fill out HTO forms, eat, and exchange information about their charges while

8    they wait.  Breen Dep. 50:13–51:7; Stewart Dep. 46:13–47:18.

9                         2.    Integral and Indispensable

10                 The second part of the Ninth Circuit's *Bamonte* test resembles the first.  An

11   "integral and indispensable" duty is one that is "necessary to the principal work performed and

12   done for the benefit of the employer." *Alvarez*, 339 F.3d at 902–03 (citing *Barrentine v.*

13   *Arkansas-Best Freight Sys., Inc.*, 750 F.2d 47, 50 (8th Cir. 1984) and *Dunlop v. City Elec., Inc.*,

14   527 F.2d 394, 398 (5th Cir. 1976)).  "[A]n activity is not integral and indispensable to an

15   employee's principal activities unless it is an intrinsic element of those activities and one with

16   which the employee cannot dispense if he is to perform those activities." *Integrity Staffing*

17   *Solutions, Inc. v. Busk*, ___ U.S. ___, 135 S. Ct. 513, 519 (2014).  This is a contextual test. *See*

18   *Alvarez*, 339 F.3d at 902.  "Congress intended the words 'principal activities' to be construed

19   liberally to include any work of consequence performed for an employer, no matter when the

20   work is performed." 29 C.F.R. § 790.8(a); *Lindow*, 738 F.2d at 1061).

21                 Courts have held a number of preliminary activities are integral and indispensable.

22   The most common of these are putting on, removing, and sanitizing protective equipment. *See,*

23   *e.g.*, *Alvarez*, 339 F.3d at 902–03.  Other compensable activities include showering and changing

24   clothes to remove toxic chemicals and sharpening knives at a meat packing plant. *Integrity*

25   *Staffing*, 135 S. Ct. at 518.  The variety of non-compensable activities is broader.  The Supreme

26   Court recently held that warehouse workers' time spent waiting to undergo an antitheft security

27   screening and undergoing those screenings before leaving the workplace each day was not

28   compensable under the FLSA. *Id.* at 518–19.  Non-compensable activities also include, for

1    example: commuting and "transportation of light equipment," *see, e.g.*, *Dooley v. Liberty Mut.*

2    *Ins. Co.*, 307 F. Supp. 2d 234, 245–47 (D. Mass. 2004); checking in and out and waiting in line to

3    check in and out, *Bernal v. Trueblue, Inc.*, 730 F. Supp. 2d 736, 741–45 (W.D. Mich. 2010);

4    waiting for paychecks, *Vega v. Gasper*, 36 F.3d 417, 425 (5th Cir. 1994); placing personal items

5    in lockers or reviewing a schedule, *Perez v. Banana Republic, LLC*, No. 14-01132, 2014 WL

6    2918421, at *5–6 (N.D. Cal. June 26, 2014); inventory and safety inspections en route to work

7    locations or home, *Colella v. City of New York*, 986 F. Supp. 2d 320, 342–44 (S.D.N.Y. 2013);

8    polishing shoes, boots and duty belts, cleaning radios and traffic vests, and oiling handcuffs,

9    *Musticchi v. City of Little Rock, Ark.*, 734 F. Supp. 2d 621, 630–32 (E.D. Ark. 2010); and, most

10    relevant here, bidding on vacation and work schedules, *Abbey v. United States*, 99 Fed. Cl. 430,

11    458–61 (2011).

12            Submitting an HTO form resembles activities in the non-compensable basket more

13    than in the compensable. *Abbey* is particularly persuasive. The *Abbey* court found bidding on

14    work schedules and for vacation leave was not necessary to the plaintiffs' work, air traffic

15    control. 99 Fed. Cl. at 459–60. It held that any benefits accruing to the employer from a happier

16    workforce were too speculative to be compensable. *Id.* at 460. And it noted the parties did not

17    dispute that employees viewed the bidding process as a benefit. *Id.* Here, requesting time off is

18    not integral to the work of an officer, and is not an indispensable part of the job. A prison would

19    remain a prison even if guards could not and did not request or take unscheduled time off. The

20    ability to request unscheduled time off is also properly viewed here as a benefit to the employees.

21            This conclusion holds despite the fact that submitting paperwork may in certain

22    circumstances qualify as compensable work. *See Dunlop v. City Elec., Inc.*, 527 F.2d 394, 399–

23    400 (5th Cir. 1976); *Davis v. Charoen Pokphand (USA), Inc.*, 302 F. Supp. 2d 1314, 1324 (M.D.

24    Ala. 2004). The paperwork at issue in *Dunlop* included daily "time-sheets, materials sheets, and

25    supply and cash requisition sheets," which "enabled the employer to calculate his costs and to

26    keep accurate records" as required by the FLSA. 527 F.2d at 400. This paperwork was "part of

27    the regular work of the employees in the ordinary course of business." *Id.* at 401. The paperwork

28    in *Davis* was similarly both mandatory and associated with the plaintiff's daily labor. 302 F.

1    Supp. 2d at 1323–24.  The same cannot be said of requests to take time off, which are not regular,

2    not required by law, and not part of the operation of a prison.

3                        3.    *De Minimis*

4                "As a general rule, employees cannot recover for otherwise compensable time if it

5    is *de minimis*."  *Lindow*, 738 F.2d at 1062.  This rule is a safety valve; it avoids a result that

6    would impose undue burdens on employers and ignore "the practical administrative difficulty of

7    recording small amounts of time for payroll purposes."  *Id.* (citing 29 C.F.R. § 785.47 ("In

8    recording working time under the Act, insubstantial or insignificant periods of time beyond the

9    scheduled working hours, which cannot as a practical administrative matter be precisely recorded

10   for payroll purposes, may be disregarded.")).  The Supreme Court has called a few seconds or

11   minutes of off-duty work "trifles" and "split-second absurdities" that "may be disregarded."

12   *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946), *superseded by statute on other*

13   *grounds as noted by Integrity Staffing*, 135 S. Ct. at 516–17.  Only "substantial" measures of time

14   and effort are compensable.  *Lindow*, 738 F.2d at 1062 (quoting *Mt. Clemens*, 328 U.S. at 692).

15   Ten minutes often serves as a rule of thumb.  *Bamonte*, 598 F.3d at 1238; *Espinoza v. Cnty. of*

16   *Fresno*, 290 F.R.D. 494, 502 (E.D. Cal. 2013).

17                The Ninth Circuit has suggested three relevant inquiries: "(1) the practical

18   administrative difficulty of recording the additional time; (2) the aggregate amount of

19   compensable time; and (3) the regularity of the additional work."  *Lindow*, 738 F.2d at 1063.

20   First, HTO request forms are time-stamped.  This suggests that if an officer is working between

21   the time she stamps the form and reports for the beginning of her shift, it would be possible to

22   compensate her for that time.  Second, stamping and submitting a form cannot take more than a

23   few minutes, but waiting for thirty or sixty minutes each time a form is submitted is not *de*

24   *minimis*, especially if all 86 plaintiffs waited.  Nevertheless, as discussed above, the officers' pre-

25   shift activities surrounding submission of an HTO request form are not compensable work.

26   Third, the officers have pointed to no evidence showing they request vacation on a regular or

27   predictable basis or that they always spend the same amount of time submitting requests.  In sum,

28   /////

                                              17

1    these facts suggest that if the process of submitting an HTO form were compensable work, it

2    would be *de minimis*.

3         D.        Gap Time Claims and Minimum Wage Claims

4              "Gap time" claims are those for "uncompensated hours worked that fall between

5    the minimum wage and the overtime provisions of the FLSA." *Adair v. City of Kirkland*,

6    185 F.3d 1055, 1062 (9th Cir. 1999). More specifically, gap time is "time that is not covered by

7    the [FLSA's] overtime provisions because it does not exceed the overtime limit, and . . . time that

8    is not covered by the minimum wage provisions because, even though it is uncompensated, the

9    employees are still being paid a minimum wage when their salaries are averaged across their

10   actual time worked." *Id.* at 1062 n.6 (citing *Hensley v. MacMillan Bloedel Containers, Inc.*,

11   786 F.2d 353, 357 (8th Cir. 1986)).

12              The Ninth Circuit has not resolved whether a plaintiff may bring "gap time" claims

13   under the FLSA. *Compare id.* ("It is not clear that a gap time claim may be asserted under the

14   FLSA, as distinguished from whatever proceedings may be available for breach of contract or

15   under the collective bargaining agreement.") *with Donovan v. Crisostomo*, 689 F.2d 869, 876 (9th

16   Cir. 1982) ("We hold that the Secretary [of Labor] may seek restitution for kickbacks from

17   straight time wages as overtime compensation for those weeks in which overtime is worked.")

18   *and Gilmer v. Alameda-Contra Costa Transit Dist.*, No. 08-05186, 2011 WL 5242977, at *14

19   (N.D. Cal. Nov. 2, 2011) (allowing recovery, under the FLSA, of "compensation at [the

20   plaintiffs'] straight time rate of pay for unpaid travel time incurred before they had accrued forty

21   hours in a given week, in those weeks when they are owed overtime damages for travel time

22   incurred in excess of forty hours."). Many circuits do not allow pure gap time claims brought

23   under the FLSA. *See, e.g., Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 244 (3d Cir. 2014);

24   *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 115–116 (2d Cir. 2013);

25   *Monahan v. Cnty. of Chesterfield, Va.*, 95 F.3d 1263, 1282 (4th Cir. 1996). Only the Tenth

26   Circuit appears to have held that gap time claims are compensable under the FLSA. *Lamon v.*

27   *City of Shawnee*, 972 F.2d 1145, 1155–59 (10th Cir. 1992); *cf. Monahan*, 95 F.3d at 1267–72

28   (interpreting *Lamon*); *Adair*, 185 F.3d at 1062 n.6 (contrasting *Monahan* and *Lamon*)

1          Given the state of the law, this court adopts the majority position that the FLSA

2  creates a cause of action for unpaid overtime, but not when hours worked fall below the

3  applicable overtime threshold, unless the average hourly rate is less than the federal minimum

4  wage.  Other district courts in this circuit have held similarly.  *See Maciel v. City of Los Angeles*,

5  569 F. Supp. 2d 1038, 1056 (C.D. Cal. 2008); *Abbe v. City of San Diego*, No. 05-1629, 2007 WL

6  4146696, at *14 (S.D. Cal. Nov. 9, 2007), *aff'd sub nom. Abbe v. v. City of San Diego, Cal.*, 444

7  F. App'x 189 (9th Cir. 2011).  *Cf. Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, 644–45 (9th

8  Cir. 2014), *as amended* (Jan. 26, 2015) ("[I]n order to survive a motion to dismiss, a plaintiff

9  asserting a claim to overtime payments must allege that she worked more than forty hours in a

10  given workweek without being compensated for the overtime hours worked during that

11  workweek."); *Perez v. Wells Fargo & Co.*, No. 14-0989, 2014 WL 6997618, at *7 (N.D. Cal.

12  Dec. 11, 2014) ("While breaks of 20 minutes or less may be 'compensable' under the FLSA, that

13  does not mean that such unpaid breaks can form the basis of an FLSA claim during a non-

14  overtime week.").

15          Here, the officers are subject to the provisions of 29 U.S.C. § 207(k) and 29 C.F.R.

16  § 553.230, which require overtime compensation for any hours worked beyond 43 in a 7-day

17  period, or 171 in a 28-day period.  The evidence before the court is insufficient to show the

18  officers have ever worked longer than 43 hours in any 7-day period.  The earliest any officer has

19  arrived to stamp an HTO request is one hour before a shift.  The officers have presented no

20  evidence that any of them arrived one hour early three times in any 7-day period.  They do not

21  contest the prison's argument that their claim is an impermissible gap-time claim.  Rather, they

22  argue that because the prison has not kept accurate time records, they are not required to address

23  the gap-time and minimum wage defenses.  *See* Opp'n MSJ 16:11–17:27.

24          In *Anderson v. Mt. Clemens Pottery Co.*, the Supreme Court considered what is

25  required of a plaintiff who brings an FLSA claim and is unable to prove the exact amount of her

26  damages because the "employer's records are inaccurate or inadequate and the employee cannot

27  offer convincing substitutes." 328 U.S. at 687.  It held that "[i]n such a situation . . . an employee

28  has carried out his burden if he proves that he has in fact performed work for which he was

1   improperly compensated and if he produces sufficient evidence to show the amount and extent of

2   that work as a matter of just and reasonable inference." *Id.* Upon such a showing, the burden

3   shifts to the employer to provide evidence of the precise time worked. *Id.* at 687–88. Awards of

4   approximate damages are then allowed. *Id.* The purpose of this rule is to prevent an employer

5   from complaining an award of damages is not precise simply because its timekeeping is

6   imprecise. *Id.*; *see also, e.g., Brock v. Seto*, 790 F.2d 1446, 1448 (9th Cir. 1986) (applying

7   *Anderson* because "the fact of damage is certain," but not the amount).

8          The burden-shifting scheme of *Anderson* does not displace the requirements Rule

9   56 imposes on a plaintiff who faces a motion for summary judgment. When MCSP filed its

10  motion for summary judgment, it faced the initial burden to describe the basis for its motion,

11  *Celotex*, 477 U.S. at 323, and show "there is an absence of evidence to support [the officers']

12  case," *id.* at 325. MCSP met this burden when (1) it argued the officers' claim was not available

13  under the FLSA because it was a gap-time claim; and (2) it cited specific facts on the record to

14  show the officers wait at most one hour before a shift, but must work more than three hours

15  beyond forty to state an overtime claim. Because MCSP has shown the facts do not support an

16  essential requirement of an FLSA claim, the burden falls upon the officers to "establish that there

17  is a genuine issue of material fact," making the case appropriate for trial. *Matsushita*, 475 U.S. at

18  585. Just like MCSP, they must "cit[e] to particular parts of materials in the record" to carry this

19  burden. Fed. R. Civ. P. 56(c)(1). Naked assertions and legal arguments are insufficient.

20  *Matsushita*, 475 U.S. at 586–87. More specifically here, before the court may apply *Anderson*,

21  the officers must present evidence to show they have "in fact performed work for which [they]

22  were] improperly compensated." 328 U.S. at 687.

23         As a preliminary matter, it is doubtful *Anderson* applies. The officers may not, as

24  a matter of constitutional law, seek damages or retroactive relief of any kind in this case, and yet

25  *Anderson* appears to require a prerequisite showing that damages are "certain." *See id.* at 688

26  ("[H]ere we are assuming that the employee has proved that he has performed work and has not

27  been paid in accordance with the statute. The damage is therefore certain."). In any event, the

28  officers have not effectively rebutted the prison's evidence. The officers assert only that the

1   prison's timekeeping records are inadequate because entering the prison takes an unspecified

2   amount of time longer than three minutes, and the FLSA sign-in sheets arrive fifteen minutes

3   before a shift.  Opp'n MSJ 16:14–22.  First, as provided in the Portal-to-Portal Act, "no employer

4   shall be subject to any liability or punishment under the Fair Labor Standards Act . . . for or on

5   account of any of the following activities . . . (1) walking, riding, or traveling to and from the

6   actual place of performance of the principal activity or activities which such employee is

7   employed to perform . . . ."  29 U.S.C. § 254(a).  Second, ignoring for the moment the Act, the

8   officers do not offer a specific rebuttal to Lt. Karr's testimony that reaching the watch office from

9   the parking lot takes three minutes.  As noted, they rely instead only on a generalized inference

10  drawn from the distance an officer must walk and the security measures in place: officers must

11  pass through two security checks, open bags for inspection, swipe ID cards, proceed to Main

12  Control, pass through gates to the prison yards (only one of the three gates may be open at the

13  same time), and walk to the Program Office.  A reasonable inference weighted in the officers'

14  favor does not establish multiple hours of walking every week.  Third, that a sign-in sheet is

15  available for signature fifteen minutes before a shift begins does not imply it must be signed

16  fifteen minutes before a shift begins.

17          The officers do not dispute the applicability of the MOU negotiated between

18  CCPOA and the State.  UMF no. 5.  The MOU requires officers be compensated at least $3,050

19  per 28-day period, *see* King Decl. Ex. 75, at 31-A; *id.* Ex. 77, at 131–32, well in excess of the

20  minimum wage for any reasonable estimate of the number of hours worked in that period.  The

21  officers therefore have not established their claims are permitted under the FLSA.  Similar

22  reasoning applies in favor of MCSP's argument that the officers are already compensated under

23  the MOU.

24  III.    CONCLUSION

25          In conclusion, the court GRANTS the defendant's motion for summary judgment.

26  The undisputed facts show the officers have not performed work compensable under the FLSA

27  and that their claims are gap-time claims not available to FLSA litigants.  The defendant's motion

28  /////

1    to decertify is therefore MOOT.  This order resolves ECF Nos. 99 and 104.  The Clerk of the

2    Court is directed to close this case.

3              IT IS SO ORDERED.

4    DATED:  March 6, 2015.

5

6

7                                   UNITED STATES DISTRICT JUDGE

8

22